David B. DUNNING; Peter B. Dunning, for himself and as representative and attorney-in-fact for his grandchildren; Claire Baker; Rachael Baker; Timothy Baker; Meghan E. Dunning; Charles B. Dunning; Bailey W. Dunning; Corey Steven Sheehan; and Hazel R. Dunning, Plaintiffs

v.

Lawrence P. BUSH; Joseph D. Bush, Gregory J. Bush; Barbara S. Bush; Mary P. Walsh; and Francis P. McCarthy, Defendants.

No. 3:05–cv–00050–JAJ.

United States District Court,
S.D. Iowa,
Davenport Division.

July 8, 2009.

represented by Thomas Hanson and Kara McClure. The defendants were represented by Robert Waterman and Jason O'Rourke. The court finds in favor of the defendants on all counts and directs the Clerk of Court to enter judgment accordingly.

## NATURE OF THE CASE

This case arises out of the August 8, 2003, agreement between the parties pursuant to which the defendants purchased the plaintiffs' interest in a company known as Twin City Minerals ("Twin City"). Twin City's only asset was its fifty percent ownership in a limited liability company known as Superior Minerals ("Superior").

After purchasing the plaintiffs' interest in Twin City, the defendants later purchased the outstanding fifty percent interest in Superior from Aggregate Industries ("Aggregate"), a British company. In this case, the plaintiffs contend that defendants Francis "Frank" McCarthy ("McCarthy") and Greg Bush ("Bush") breached their fiduciary duties by not disclosing information material to the sale of plaintiffs' interest in Twin City prior to August 8, 2003. They also contend that the defendants violated Iowa insider trading laws. Finally, plaintiffs contend that the defendants improperly recalculated the purchase price of plaintiffs' shares after the December 2003 stock redemption agreement between Twin City and Aggregate made Twin City the sole owner of Superior.

Fred E. Beaver, Kara L. McClure, Thomas D. Hanson, Hanson, Bjork & Russell, LLP, Des Moines, IA, for Plaintiffs.

Robert V.P. Waterman, Jr., Jason J. O'Rourke, Lane & Waterman, LLP, Davenport, IA, for Defendants.

## ORDER

JOHN A. JARVEY, District Judge.

This matter comes before the court pursuant to trial on the merits which commenced on January 20, 2009, and concluded January 26, 2009. The plaintiffs were

## FINDINGS OF FACT

Almost all of the facts necessary to resolve the issues in this case took place in 2003. As of January 1, 2003, the plaintiffs were fifty percent owners of the stock of Twin City. The defendants and one other individual owned the remaining fifty percent. Twin City's only asset was its membership interest in Superior, a venture in

which Twin City and Aggregate each owned a fifty percent interest. The management committee[1] of Superior consisted of eight individuals. Plaintiffs' interests in Superior were represented by Peter Dunning and his son David Dunning. The defendants' interests were represented by McCarthy and Bush. Aggregate had four members on the management committee.

Superior was a grinder of materials[2] used to make concrete and asphalt shingles. In the 1990s, Aggregate supplied the material to be ground. Later in the relationship, the material was supplied by Linwood Mining ("Linwood"), a separate company owned by McCarthy and Bush.

Throughout the 1990s, Superior made money. Because of a downturn in the economy and another problem to be discussed at length below, Superior reported significantly reduced profits in 2000 and operating losses in 2001 and 2002. Throughout the first eight months of 2003, it appeared that Superior would continue to lose money from its operations.

In the fall of 2002, Peter Dunning announced his intention to cease active participation in Superior so that he could retire and move to Vail, Colorado. Donald Vry was hired to replace Peter Dunning. By early 2003, David Dunning was also leaving Superior. Superior's representatives from Aggregate did not get along well with the Dunnings and Vry did not get along with David Dunning. In short, the Dunnings wanted out.

A meeting was set up in late January 2003 to discuss the possibility that the defendants might purchase the plaintiffs' shares in Twin City. On January 27, 2003, a draft stock purchase agreement was sent to Peter Dunning and his attorney, Mi-

chael Giudicessi, of the Faegre & Benson law firm in Des Moines, Iowa. (Pl. Ex. 1). Mr. Giudicessi responded quickly, stating that Peter Dunning would take the lead in reviewing the documents but that Giudicessi would, of course, comment on them as well. (Pl. Ex. 2).

During the January 2003 meeting in Davenport, Iowa, Bush and McCarthy encouraged Peter Dunning to stay in the business. They also offered to sell their shares of Twin City to the plaintiffs. However, given Peter Dunning's desire to avoid making future capital contributions to the company as required by the bank, his desire to leave the business and retire, and the personality disputes between the Dunnings and Aggregate, any suggestion that the Dunnings purchase the defendants' shares did not gain much traction. Peter Dunning demanded $2.5 million for his group's shares. The defendants refused to pay that amount. Dunning then offered to take a reduced payment in exchange for a share of Superior's profits over the next ten years.

Superior faced a number of significant problems in 2003. First, it had lost money for two consecutive years and its prospects for making money in 2003 were not good. Second, Superior's financing with U.S. Bank was coming due in September 2003 and Superior had to find a way to refinance its debt. The conditions of the existing financing required Twin City and Aggregate to make capital contributions to Superior whenever certain of its financial positions fell below specified levels. The parties had been required on several occasions to make these capital contributions. As noted above, one reason Peter Dunning

---

**1.** The equivalent of a board of directors for an Limited Liability Corporation.

**2.** Those materials were described in Peter Dunning's testimony as slag, calcium carbon-

ate and dolomite. Slag is used in some forms of concrete. The other materials were ground for use in roofing shingles.

wanted to leave the business was that he did not want to make any further capital contributions. He informed the others in January 2003 that he did not want to make any more. Bush and McCarthy agreed that while they negotiated the Dunnings' stock purchase agreement, the Dunnings would not be required to make capital contributions.

The third problem facing Superior in 2003 was the failure of a joint venture that it had entered into with a company called Lehigh. Pursuant to this joint venture, Superior was to grind material used by Lehigh into high brightness concrete. Lehigh had contributed approximately two million dollars of equipment to this joint venture. Superior gave the joint venture an approximately two million dollar note. Superior was to pay off the note by grinding the material over a twenty year period. However, the material ground by Superior did not meet Lehigh's specifications. Superior contended that the equipment purchased by Lehigh was incapable of economically grinding the material to specification. By late 2002, it appeared as though Lehigh was prepared to sue Superior. The failure of Superior to generate a profit, problems with Lehigh, including the possibility of getting sued, made the prospect of refinancing Superior difficult, to say the least.

From the end of January until the beginning of July 2003, discussions about purchasing the plaintiffs' interests in Twin City laid relatively dormant. On July 1, 2003, Peter Dunning, through Giudicessi, sent an e-mail to the defendants' attorney, James Mezvinsky, asking to resume discussions concerning the purchase of plaintiffs' interests in Twin City. Giudicessi made a new proposal and requested to know the defendants' position. (Pl. Ex. 3). Defendants did not respond for two weeks. However, beginning in late July, negotiations took on more of a sense of urgency.

Most of the negotiations on the remaining issues in dispute occurred between July 29 and August 6, 2003.

On July 29, 2003 the parties met again. In preparation for this meeting, attorney Giudicessi sent a memorandum dated June 25, 2003, to counsel for the defendants regarding items that required attention. Included in the items for discussion was the plaintiffs' desire to reevaluate the stock price if the defendants were ever to acquire Aggregate's fifty percent interest in Superior. Plaintiffs wanted to share in any higher valuation subsequently given to Aggregate's interest in Superior. The defendants objected to such a provision. During or shortly after the July 29, 2003, meeting, Frank McCarthy again asked Peter Dunning to stay in Superior for another year so that problems with Superior's management could be stabilized. Dunning declined. McCarthy's second suggestion was that the contract not be revalued in the event that the defendants acquired Aggregate's interests. Defendants' third position was that they were willing to accept the revaluation provision so long as it went both ways, meaning that plaintiffs' interest would be revalued higher if Aggregate was bought out at a "high" price but that plaintiffs' interest would be revalued lower if Aggregate was bought out at a "low" price.

In his July 25, 2003 memorandum Mr. Giudicessi used broad language to describe the event whereby plaintiffs' stock in Superior would be revalued, i.e.:

- If acquirers resale shares or **sale/change of control event** such as but not limited to an asset sale, stock sale or **transfer of control for Twin City and/or Superior** (including a purchase by Linwood/Bush of Aggregate's interest in Superior or a purchase by Aggregate of Linwood/Bush interests in Superior or Twin City), then in addition to

acceleration of fixed payment and satisfaction of performance payment obligations, a purchase price adjustment will be made to provide sellers a pro rata portion of any increase in company or share value calculated using the effective price generated by the sale/change of control event. Thus, Dunning, sellers, shall have the effective benefit, on a prorated basis, to ride along or tag along with such a sale event as if they had remained shareholders. (Bold emphasis added).

(Pl. Ex. 128). It is clear that it was the plaintiffs' intent to benefit from any event under which Aggregate left the venture and the defendants owned all of Superior. The defendants' only concern with this proposal was that it operate in both directions.

The plaintiffs selected McCarthy's third choice and requested that stock be revalued, up or down, in the event that the defendants acquired Aggregate's interest in Superior. Accordingly, section 1.4 of the Stock Purchase Agreement was drafted by the defendants' attorney and reviewed and modified by the plaintiffs prior to its insertion in the final contract.

None of the parties to this lawsuit had any way of knowing how much Aggregate would demand for its fifty percent interest in Superior. Aggregate is a very large, publicly traded, international corporation. McCarthy had once guessed that Aggregate would want somewhere in the neighborhood of five million dollars for its interest, but this was nothing more than his opinion based on his speculation. In fact, Peter Dunning testified at trial that in late November 2002 he, Bush, and McCarthy discussed the possibility of buying Aggregate's interest in Superior and their collective "best guess" or "opinion" was that it might take five million dollars to buy them out. Aggregate did not formulate a selling price prior to September 2003.

Following the July 29, 2003 meeting there was a flurry of activity. On August 6, 2003, Giudicessi made the appropriate changes to the section 1.4 revaluation provision (subject to Peter Dunning's approval) and indicated that the plaintiffs wanted contract language negotiations to be finalized that day. (Pl. Ex. 129). A final copy of the contract was signed two days later on August 8, 2003. Section 1.4 of the agreement states, in pertinent part:

1.4 *Purchase of Aggregate Industries Shares.* In the event, prior to December 31, 2012, Buyers or a related or affiliated entity, purchase substantially all of the share in Superior owned by Aggregate Industries or an affiliate of Aggregate Industries, the purchase price per share hereunder shall be recalculated in a manner similar to the method set forth in Section 1.3 hereunder . . . .

### THE LEHIGH–SUPERIOR PROBLEM

In the fall of 2002, the management committee at Superior believed it was likely that Superior was going to be sued by Lehigh for the failed joint venture. Representatives of Aggregate completely took over discussions with Lehigh. Aggregate and Lehigh, both large corporations in the aggregate and cement industry, did other business together and, therefore, Aggregate was in a better position to negotiate with Lehigh than were the defendants. Pat Groff, on behalf of Aggregate informed its partners in Superior of the status of the Lehigh negotiations primarily through the management committee meeting process. For example, on May 7, 2003, Superior's second management committee meeting of the year was held. At this meeting, Aggregate reported that it was negotiating a settlement with Lehigh under which each side would, in essence, walk away from the joint venture. In addition, however, Aggregate was demanding additional consid-

eration for Superior. In fact, Aggregate had made a demand for an additional three million dollars in payments from Lehigh to Superior over time. It was suggested that Lehigh could make these payments in kind by providing large amounts of cement at no cost to Superior. Aggregate was authorized at the May 7, 2003, Superior management committee meeting to reduce the three million dollar demand in subsequent negotiations. Although Peter Dunning did not attend this management committee meeting or receive minutes from this meeting, he admitted receiving other reports indicating that the negotiations were ongoing. (Pl. Exs. 59, 62, 102).

McCarthy and Bush next learned about the status of the Lehigh cement settlement negotiations shortly prior to July 20, 2003. At that time, Aggregate's regional president and member of Superior's management committee, Pat Groff, told Bush and McCarthy that settlement negotiations with Lehigh were drawing to a conclusion. He informed them that, under the terms of the proposed settlement, Lehigh would keep the equipment that it contributed to the joint venture and forgive Superior's note in approximately the same amount. This is the "walk-away" portion of the negotiations discussed earlier. When asked by Bush and McCarthy about the idea that Superior would provide cement at no cost over a period of years, Groff was less specific. As he testified in his deposition, the "theory" of that provision, as well as the amount of free cement were very uncertain at that point. However, McCarthy pressed Groff on this issue because the potential terms of any such settlement would undoubtedly be important to Superior in securing new bank financing by September. At that point, McCarthy was told that Aggregate was demanding $1.5 million worth of cement as part of the settlement package. McCarthy thought this was too aggressive of a position for the settlement negotiations and did not think

that Superior would get it. Still, McCarthy was anxious to discuss it with the defendants' outside accounting firm to see what impact such a settlement might have on Superior's financial statements. Those discussions with Superior's accountants took place on July 30, 2003. Basically, in the event that Lehigh agreed to this provision of the settlement, the defendants wanted to book all of the "income" from the cement in 2003 even though it would be received over the next five years. By August 5, 2003, the accountants informed the defendants of the conditions under which this could happen. (Pl. Ex. 102).

During the same conversation at which Groff informed McCarthy and Bush of the status of the Lehigh settlement negotiations, Groff also told Bush and McCarthy that Aggregate would not continue to infuse capital into Superior or provide a letter of credit in support of Superior's upcoming refinancing. This was particularly bad news. Two of the three groups that owned Superior had now informed Bush and McCarthy that they did not want to prop up this failing company. If true, Superior could not refinance its debt with U.S. Bank as the bank had demanded the capital contributions as a condition of the loan and had indicated that it would not refinance Superior on as favorable terms as it had in the past, in light of Superior's failure to turn a profit. Even worse for Bush and McCarthy at that point was the fact that their other company, Linwood, was providing the material that Superior was grinding. Superior owed Linwood more than $1.8 million in accounts payable and the terms of the U.S. Bank financing prohibited Superior from paying anything to Linwood at that point. Finally, the bank financing also required Linwood to guarantee that Superior would not file for relief in the bankruptcy court.

McCarthy and Bush were justifiably concerned about Aggregate's position regarding its refusal to make capital calls or provide a letter of credit. However, McCarthy did not entirely believe Groff in this regard as Aggregate had a history of not abandoning its partners in tough times. Despite the fact that he made these statements days prior to July 20, 2003, Groff's position softened and in the week prior to the execution of the stock purchase agreement at issue in this case, Groff and McCarthy were again exploring the possibility of a letter of credit or internal financing by Aggregate Industries. See Plaintiffs' Ex. 65 (July 30, 2003 internal document from U.S. Bank stating "Frank McCarthy indicated he would know more by August 8 as the British ownership is considering alternatives. On the table are a plan to supply a letter of credit to USB, internal financing via Aggregate Industries and ownership buy outs with acceptable support to USB."); Plaintiffs Ex. 66 (August 7, 2003 internal document from U.S. Bank stating "Frank McCarthy indicated that issues with Pete Dunning were resolved. They were entering into a session with Aggregate re our L/C proposal, internal funding or a mutual buy out.").

Finally, as McCarthy and Bush left their meeting with Groff shortly before July 20, 2003, Groff casually asked McCarthy and Bush if they would have any interest in buying Aggregate Industries' interest in Superior. Groff had no authority from his superiors to sell Aggregate's interests and asked the question just to see how McCarthy and Bush would react. Bush and McCarthy stated that it was something they would consider. Like other matters, Bush and McCarthy discussed this with their outside accountants. Nothing else was done with this suggestion until September 2003.

By January 1, 2003, Peter Dunning and David Dunning were both focused on exiting Superior. Both had resigned as officers. Peter Dunning immediately quit attending management committee meetings. David Dunning quit after the February meeting. Had either of them attended the May 7, 2003, management committee meeting, they would have known everything that Bush and McCarthy knew about the status of the Lehigh settlement negotiations other than what Groff told McCarthy and Bush shortly before July 20, 2003, about the amount of cement to be provided. They also would have known that anything Superior received by way of "free"[3] cement would contribute to the profitability of Superior. Peter Dunning testified that he believed on August 8, 2003, that the Lehigh–Superior dispute would be settled, that it would involve Lehigh keeping assets and cancelling Superior's note and that it would improve Superior's balance sheet.

David Dunning tried to imply in his testimony that he was somehow excluded from management committee meetings. When questioned further, Dunning indicated that he wanted to attend the meetings but he did not know when they were. He had no explanation as to why he did not ask anyone when they were. While it may have been true that Aggregate's representatives did not care for the Dunnings, the same was not true for Bush and McCarthy. Bush and McCarthy represented the Dunnings' interests in discussions with Aggregate and even agreed to pay a modest severance agreement for Peter Dunning

---

**3.** The parties and the court have used the term "free" to refer to cement received from Lehigh pursuant to the settlement agreement. Obviously, there was nothing free about the cement. That term is simply used to refer to the fact that the cement would be provided to Superior over a number of years without additional payment.

out of Linwood Mining funds when Aggregate insisted that Dunning not be given a severance package.[4] The Dunnings, Bush and McCarthy remained friendly and professional to the end. The court believes that the Dunnings did not attend the management committee meetings because they had resigned from active management of the company and focused their attention on negotiating their stock purchase agreement.

There were several suggestions throughout the trial that it was the defendants who attempted to hurry these stock purchase agreement negotiations. While it is certainly true that it was in both sides' interests to determine quickly whether they could make a deal, it was Peter Dunning who initiated the negotiations in January and again in July, and who expressed a desire to get the deal done as quickly as possible. The reason for this is obvious. He knew that Superior had been losing money, that he needed to make and did not want to make capital contributions, and that Superior had its financing coming due in September. Peter Dunning's desire to retire, sell, not make capital contributions, not worry about refinancing and lock in a sale price were significant incentives to get this deal done quickly.

The defendants also benefitted from a prompt conclusion to these negotiations. In order to get refinancing for Superior, McCarthy needed to tell any new bank who was behind this company. Because Dunning was not making capital contributions, he and Bush and Linwood Mining had become more vulnerable.

After the Dunning Stock Purchase agreement was signed on August 8, 2003, McCarthy continued to work on efforts to refinance Superior's debt obligations. A draft of the Lehigh–Superior settlement was first provided to the defendants on August 13, 2003. The draft agreement was forwarded to Superior's outside accountants at Deloitte on August 14, 2003. However, the Lehigh–Superior settlement agreement was not executed until November 17, 2003. Still, the draft received in mid-August gave McCarthy what he needed to make a credible application for refinancing of the notes coming due in September. On August 15, 2003, Aggregate's Groff circulated an internal memorandum at Aggregate indicating that the Lehigh cement negotiations were in progress and that he expected them to be resolved within thirty days. *See* Plaintiffs Ex. 21. He recommended at that time that Aggregate proceed to negotiate an exit strategy with respect to its interests in Superior. Groff recommended an exit strategy because Superior was not purchasing dolomite from Aggregate to grind and because Superior was heavily in debt and faced an uphill journey to profitability. Further, Groff was concerned that continued involvement in Superior would require additional capital contributions and/or a letter of credit from Aggregate, which he did not believe was prudent. Still, Aggregate did not make the decision to sell and Groff had no authority to negotiate a sale prior to September 10, 2003.

On or about September 10, 2003, Groff was given authority to commence negotiations for the sale of Aggregate's interests in Superior to the defendants. Negotiations took place over the next several months and culminated in an agreement effective November 30, 2003, to close on December 8, 2003. The agreement, entitled Membership Interest Redemption Agreement, states as follows in Section 1.1: "Buyer agrees to purchase from the

---

**4.** Additional consideration was ultimately paid by the defendants to compensate Peter Dunning for severance interests.

Seller, and Seller agrees to sell, transfer, convey and deliver to the Buyer, or its nominee, all the Interests, which as of the Closing Date shall be free and clear of all liens or encumbrances of any nature." Section 1.2 indicated that the total consideration for the interest purchased was $950,000 plus assignment of the Cement Supply Agreement dated September 15, 2003, that Superior had secured from Lehigh as a part of the resolution of their dispute.[5] Shortly after the closing, McCarthy and Bush called Peter Dunning to inform him that they had acquired Aggregate's interests in Superior and that a revaluation of Dunning's Stock Purchase Agreement was triggered pursuant to Section 1.4 of that Agreement.

### CONCLUSIONS OF LAW

#### Breach of Fiduciary Duty

 As set forth by the United States Court of Appeals for the Eighth Circuit: Fiduciary duties of directors and shareholders are governed by the state of incorporation, in this case Minnesota (Twin City is a Minnesota corporation). *Potter v. Pohlad*, 560 N.W.2d 389, 391 (Minn.Ct.App.1997). Minnesota law recognizes that shareholders of closely held corporations, such as one comparable to Twin City, owe fiduciary duties to each other. *Gunderson v. Alliance of Computer Prof'ls, Inc.*, 628 N.W.2d 173, 185–86 (Minn.Ct.App.2001); *Berreman v. West Publ'g Co.*, 615 N.W.2d 362, 367 (Minn.Ct.App.2000). Minnesota court have required that shareholders of a closely held corporation have a duty to deal " 'openly, honestly, and fairly with other shareholders.' " *Berreman*, 615 N.W.2d at 371 (quoting *Pedro v. Pedro*, 489 N.W.2d 798, 801 (Minn.Ct.App. 1992)). The fiduciary duties of a share-

holder in a closely held corporation also include "the duty to disclose material information about the corporation." *Id.; Gunderson*, 628 N.W.2d at 186 ("Likewise, close-corporation shareholders owe each other a duty of loyalty, which encompasses an obligation to act with complete candor in their negotiations with each other."). This duty "does not extend to obvious matters." *Gunderson*, 628 N.W.2d at 188. Fiduciaries also may not usurp business opportunities for their own benefit. *Triple Five of Minn., Inc. v. Simon*, 404 F.3d 1088, 1096–97 (8th Cir.2005) (citing *Miller v. Miller*, 301 Minn. 207, 222 N.W.2d 71, 78 (Minn.1974)). In addition, directors of a closely held corporation owe fiduciary duties to individual shareholders. *See Regan v. Natural Res. Group, Inc.*, 345 F.Supp.2d 1000, 1011–12 (D.Minn.2004). It is clear that Defendants, as both directors and shareholders of Twin City, a close corporation, owed a fiduciary duty to Dunning, who was also a shareholder and director of Twin City. *Dunning v. Bush*, 536 F.3d 879, 886–87 (8th Cir.2008).

 To prevail on a claim for breach of fiduciary duty, the plaintiff must prove: (1) the existence of a duty; (2) the breach of that duty; (3) causation; and (4) damages. *Storage Tech. Corp. v. Cisco Sys., Inc.*, 2003 WL 22231544 *10 (D.Minn.2003) (citing *Conwed Corp. v. Employers Reinsurance Corp.*, 816 F.Supp. 1360, 1362 n. 3 (D.Minn.1993)). As set forth above, the Eighth Circuit Court of Appeals has determined that defendants owed a fiduciary duty to plaintiffs. Thus, the court must determine whether defendants breached that duty, and whether the evidence produced at trial provides a reasonable basis

---

**5.** The date of the Cement Supply Agreement is a typographical error. That Agreement was dated November 17, 2003.

for the conclusion that it is more likely than not that defendants' conduct caused damages to the plaintiffs. *Nguyen v. Control Data Corp.*, 401 N.W.2d 101, 105 (Minn.Ct.App.1987) (noting further that "[a] mere possibility of causation is not enough."); *Padco, Inc. v. Kinney & Lange*, 444 N.W.2d 889, 891 (Minn.Ct.App.1989) (noting that a "negligence count alleges the same elements which would be required for a claim of breach of fiduciary duty."); *Azbill v. Grande*, 2005 WL 1331718 (Minn.Ct.App.2005) (affirming denial of district court's refusal to allow plaintiff to amend her complaint to add a claim of breach of fiduciary as futile, noting that the fiduciary claim would fail for lack of causation, as did plaintiff's negligence claim).

■ With respect to damages, as actions for breach of fiduciary duty generally sound in equity, recoverable damages include the lost value of an asset, the profit of which a beneficiary was deprived, or any improper financial gains made by the fiduciary. *R.E.R. v. J.G.*, 552 N.W.2d 27, 30 (Minn.Ct.App.1996); *Pedro v. Pedro*, 489 N.W.2d 798, 802 (Minn.Ct.App.1992) (finding appropriate measure of damages for breach of fiduciary duty to be the difference between the fair value of the minority shareholder's shares and the actual purchase price of the buyout).

■ In determining whether the non-disclosed information is "material," the court must look to the specific facts of the case and determine the "significance the reasonable investor would place on the withheld or misrepresented information." *Basic, Inc. v. Levinson*, 485 U.S. 224, 240, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Under the "probability-magnitude approach" adopted by the Supreme Court in *Basic, Inc. v. Levinson*, in the context of federal securities laws, materiality with respect to preliminary merger discussions "will depend at any time upon a balancing of both

the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." *Id.* Probability is assessed by evaluating the "indicia of interest in the transaction at the highest corporate level." *Id.* at 239, 108 S.Ct. 978 ("[W]e note by way of example that board resolutions, instructions to investment bankers, and actual negotiations between principals or their intermediaries may serve as indicia of interest."). Magnitude is evaluated by considering factors such as the "size of the two corporate entities and of the potential premiums over market value." *Id.*

■ Applying the "probability-magnitude" approach to the facts of *Berreman*, the Minnesota Court of Appeals held that tentative or preliminary merger discussions were not material as a matter of law and need not have been disclosed to minority shareholder Berreman prior to his decision to sell his shares of West. *Berreman*, 615 N.W.2d at 372 (noting that West had made no decision at the time Berreman sold his shares to solicit bids for the sale of West, and that "the federal courts have been reluctant to find materiality in the absence of evidence that the corporation engaged in discussions with potential buyers"). "[T]entative, speculative discussions about merger are not material." *Id.*

Plaintiffs contend that the defendants breached their fiduciary duties in failing to disclose the following, material information: (1) Aggregate had decided to forego any further financial support of Superior; (2) Aggregate desired to divest its interest in Superior; (3) the essential terms of a settlement between Superior and Lehigh had been drafted; and (4) favorable financing would be available without guarantees. Plaintiffs claim that they were unaware of this information when they signed the Stock Purchase Agreement, and that such

information was of vital importance in valuing Plaintiffs' shares in Twin City. Plaintiffs further claim that Bush's request that Peter Dunning "trust [him]" and comments that Aggregate would not sell "cheaply" violated Bush's fiduciary duties of candor, honesty, loyalty and full disclosure. Plaintiffs argue finally that these matters were not "obvious" as Peter Dunning had retired from Twin City in 2002 and was no longer involved with its business and daily activities.

Defendants argue that they did not breach their fiduciary duties to plaintiffs, noting that any information they possessed prior to August 8, 2003, when Peter Dunning signed the Stock Purchase Agreement, regrading the potential sale of Aggregate's interests was not material. Defendants further argue that Peter Dunning was already aware of the possibility that Superior would purchase Aggregate's share of the business at the time he signed the Stock Purchase Agreement. Likewise, defendants argue that Peter Dunning knew that Superior was going to be negotiating a new banking agreement prior to the end of September 2003, that U.S. Bank was not enthusiastic about renewing Superior's loan, and that Superior was going to have to find a different bank. According to defendants, no alternate financing had, in fact, been arranged prior to August 8, 2003. With respect to the settlement of the Lehigh dispute, defendants claim that they had no information to disclose to the plaintiffs as it was Aggregate, and not Superior, that negotiated the resolution with Lehigh. Defendants note that Peter Dunning was well aware, long before he signed the Stock Purchase Agreement, of the dispute with Lehigh, that there were ongoing discussions to attempt to resolve it and the terms upon which a settlement would be based. Finally, defendants argue that there is no evidence that Bush had any knowledge of what Aggregate—a publicly traded company—

would demand for its interest in Superior. Any opinion in this regard offered by Bush cannot constitute the basis for a breach of his fiduciary duty.

The court will address each of defendants' alleged breaches of fiduciary duty.

### Defendants' Failure to Disclose Aggregate's Refusal to Continue its Financial Support of Superior

▮ Just prior to July 20, 2003, Groff (Aggregate's Regional President) informed McCarthy and Bush that Aggregate would not continue to infuse capital into Superior or provide a letter of credit in support of Superior's upcoming financing. Absent such a commitment from Aggregate, Superior would not have the option of refinancing with U.S. bank. McCarthy did not believe Groff entirely, given Aggregate's history of not abandoning its partners in difficult financial times. Ultimately, in the week prior to the execution of Plaintiffs' Stock Purchase Agreement, Aggregate changed its position and Groff and McCarthy were again exploring the possibility of a letter of credit or internal financing by Aggregate.

The court finds the defendants' testimony credible that they never actually believed that Aggregate would withhold its financial support of Superior. Consistent with the defendants' belief that Aggregate was posturing, Aggregate and the defendants were exploring the possibility of a letter of credit or internal financing by Aggregate in the week prior to Plaintiffs signing the Stock Purchase Agreement. *See* Plaintiffs Ex. 61. Therefore, the fact that Aggregate had threatened to withhold financial support, which was not taken as a legitimate threat by the defendants, was not material and defendants had no duty to disclose such information. By the time the plaintiffs signed the Stock Purchase Agreement, Aggregate had changed its position on the issue. Plaintiffs' breach of

fiduciary duty claim based on this alleged nondisclosure must fail. The suggestion that this or other information meant Aggregate would obviously sell its interest cheap, has no support whatsoever. If it were true that Aggregate would no longer support the venture, it would have been just more bad news for both the plaintiffs and defendants herein.

### Defendants' Failure to Inform Plaintiffs of Aggregate's Desire to Divest its Interest in Superior

■ As the defendants left their meeting with Groff, shortly before July 20, 2003, Groff casually asked McCarthy and Bush if they had any interest in buying Aggregate's interest in Superior. At this point, Groff had no authority to sell, but rather asked the question only to gauge the defendants' reactions. Bush and McCarthy replied that it was something they would consider. A July 20, 2003 internal Aggregate email states: "We have had discussions with Linwood regarding the possibility of our exiting the business ... Linwood was interested in purchasing our 50 percent ownership and wanted a little more time to give it more thought." *See* Exhibit 27. Nothing else was done with this suggestion until September 2003. *See* Exhibit 22 (An internal Aggregate e-mail dated September 4, 2003 stating: "Assuming we go forward with the Lehigh agreement, the next step is to negotiate a sale of Superior ..."); Exhibit 23 (An internal Aggregate e-mail dated September 10, 2003 stating: "We can begin negotiations with Linwood on the sale of Superior."). Aggregate had not made a decision to sell and Groff had no authority to negotiate a sale prior to September 10, 2003.

The court has considered the specific facts of this case and, in applying the "probability-magnitude" approach set forth in *Basic, Inc. v. Levinson*, finds that Graff's one-time casual inquiry is not ma-

terial and need not have been disclosed. As set forth above, Groff had no authority to sell and Bush and McCarthy stated merely that buying Aggregate's interest in Superior was something they would consider. As of September 10, 2003, Aggregate stated that it could begin negotiations with the defendants on the sale of Superior. Thus, while the "magnitude" factor may weigh in favor of a finding of materiality, the "probability" of the event is sufficiently remote and speculative as of the time Peter Dunning signed the SPA, that the court finds that it is not material. Peter Dunning was aware of the possibility of the defendants buying out Aggregate's interest in Twin City. *See* Plaintiffs Ex. 30 (letter from Peter Dunning to defendants stating "It [the negotiations] took a long time and I was concerned about the possibility of the Bush group buying out the interest of Aggregate Industries."). Defendants did not breach their fiduciary duty to the plaintiffs by failing to disclose Groff's casual, non-authorized inquiry as to defendants' possible interest in acquiring Aggregate's interest in Superior.

### Defendants' Failure to Disclose the Current Status of the Ongoing Lehigh–Superior Settlement Negotiations

As of January 2003, when the parties began negotiating, Peter Dunning was aware that one of the three primary problems facing Superior was the resolution of the "issue of the failed agreement between Lehigh Cement Company and Superior." Plaintiffs Ex. 30. At the May 7, 2003 management committee meeting, which the Dunnings did not attend, Aggregate reported that it was negotiating a settlement with Lehigh which would involve both sides walking away from the joint venture. Aggregate also reported that it was demanding an additional three million dollars in payments from Lehigh to Superior over time. Prior to the July 20, 2003

meeting, Groff told Bush and McCarthy that settlement negotiations with Lehigh were nearing a close and that, under the terms of the proposed agreement, Lehigh would keep the equipment it contributed to the joint venture and forgive Superior's note in the same amount. Groff also told Bush and McCarthy that Aggregate was demanding $1.5 million worth of cement as part of the deal. McCarthy thought this was too aggressive of a position, but nonetheless took the information to Superior's accounting firm to discuss the potential impact of such a settlement on Superior's financial statements.

As of August 8, 2003, Peter Dunning testified that he believed that the Superior Lehigh–Superior dispute would be settled, that it would involve Lehigh keeping assets and cancelling Superior's note and that it would improve Superior's balance sheet. A draft of the Lehigh–Superior settlement agreement was first provided to the defendants on August 13, 2003, which defendants forwarded to their outside accountants on August 14, 2003. The settlement agreement was not finally executed until November 17, 2003.

 The court finds that the defendants knew the current status of the ongoing Superior–Lehigh settlement negotiations prior to the time Peter Dunning signed the Stock Purchase Agreement, and that such information was material and should have been disclosed. However, plaintiffs' claim cannot succeed because there is no credible evidence that the Dunnings were damaged by this nondisclosure. The court does not find credible Peter Dunning's testimony that he would have not signed the SPA had he known the status of the Superior–Lehigh settlement negotiations. As set forth above, by this point, the Dunnings were driven by their desire to exit the business, avoid future capital contributions, and avoid the uncertainty of the financing arrangement Superior had to negotiate by September. Moreover, the plaintiffs produced no evidence as to exactly how they were damaged by this nondisclosure. Further, he knew enough about the status of those negotiations to know that the problem would be resolved. It did not matter to him. The court finds that the plaintiffs have not proved their breach of fiduciary duty claim on defendants' failure to disclose the current status of the Superior–Lehigh settlement negotiations.

### Defendants' Failure to Disclose that Favorable Financing was Available without Guarantees

At times relevant to this lawsuit, McCarthy served on the board of directors of THE National Bank. In the last week of August 2003, Superior prepared its loan application to THE National Bank. The application was approved on September 11, 2003, and the transaction closed on September 15, 2003. *See* Plaintiffs Ex. 121; 122. The refinancing deal was put together and approved very quickly, soon after the close of the Stock Purchase Agreement. Nonetheless, there was absolutely no evidence produced at trial that favorable financing without guarantees was, in fact, available as of August 8, 2003. Peter Dunning knew that Superior's financing with U.S. Bank was coming due by the end of September 2003. Plaintiffs Ex. 30. And as noted above, Superior had lost money in 2001 and 2002. Its operations conducted in 2003 also lost money. It was only because of the Lehigh settlement that Superior was able to record a profit that year, which unquestionably improved the company's financial position, at least on paper. The defendants had no fiduciary duty to disclose, prior to the signing of the Stock Purchase Agreement, that favorable financing was available without guarantees, because it was not. Plaintiffs' breach

of fiduciary duty claim on this alleged non-disclosure fails.

### Bush's Request that Dunning "Trust [Him]" and Comments that Aggregate Would Not Sell "Cheaply" Violated Bush's Fiduciary Duties of Candor, Honesty, Loyalty and Full Disclosure

Plaintiffs' claim that Bush's alleged comment that Aggregate would not sell "cheaply" violated his fiduciary duty of candor and honesty because Groff's casual comment shortly prior to July 20 inquiring about Bush and McCarthy's interest in purchasing Aggregate's interest in Superior, together with its stated refusal to continue making capital contributions were an obvious indication that Aggregate was willing to sell out on the cheap. This contention is not true. As set forth above, while Aggregate stated that it would not make additional capital contributions, McCarthy reasonably believed that this was simply posturing. McCarthy was aware of Aggregate's historical loyalty to its partners and its unwillingness to walk away from struggling ventures. More importantly, Aggregate's position vacillated. In fact, on at least two occasions between July 20, 2003, and August 8, 2003, Aggregate continued to discuss the possibility of providing a letter of credit or even having Aggregate internally finance Superior. Considered in context, Aggregate's statements did not genuinely convey an intention to refuse to support Superior, and such statements were not received as such by the defendants. The facts of this case simply do not back up the contention that Aggregate had somehow telegraphed a position that it was ready to sell its interest in Superior on the cheap.

Bush's comments were, at most, his speculative opinion. Peter Dunning is a sophisticated and astute businessman.

There is no evidence that Bush had any knowledge superior to that of Peter Dunning as to what Aggregate would accept for its interest in Superior. The court does not believe that Peter Dunning relied on Bush's opinion and/or request that Dunning "trust him" in causing Dunning to agree to defendants' "up-and-down" provision of Section 1.4 of the Stock Purchase Agreement. The Dunnings wanted out. Plaintiffs' breach of fiduciary claim that defendants violated their duties of candor, honesty, loyalty and full disclosure must fail.

### Section 502.402 of the Iowa Securities Act

Count V of plaintiffs' complaint is based on Iowa Code § 502.402 (2003)[6], which provides:

> It is unlawful for any person who is or was on officer, director or affiliate of an issuer or any other person whose relationship to the issuer or to any of the foregoing persons gives or gave such person access directly or indirectly, to material information which is of decisive importance about the issuer or the security not generally available to the public, to purchase or sell any security of the issuer in this state at a time when that person knows such information about the issuer or the security gained from such relationship, which information
>
> 1. Would significantly affect the market price of that security.
>
> 2. Is not generally available to the public; and
>
> 3. Such person knows is not intended to be so available, unless that person has reason to believe that the other party to such transaction is also in possession of such information.

---

**6.** Section 502.402 was struck in 2004 and replaced. The provision quoted above was the applicable law at the time of the transaction at issue.

As Iowa securities law is parallel to federal securities law, the court will construe § 502.402 in accordance with established law, and the "test for judging the materiality of a fact in cases such as this is set out in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 [96 S.Ct. 2126, 48 L.Ed.2d 757] (1976)." *Life Investors, Inc. v. AGO Holding, N.V., et al.*, 1981 WL 1698 (N.D.Iowa 1981). "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Industries*, 426 U.S. at 439, 96 S.Ct. 2126.

> It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote, but contemplates a showing of a substantial likelihood that, under all of the circumstances, the omitted fact would have assumed actual significance in the reasonable shareholder's deliberations.

*Id.* "Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* at 449, 96 S.Ct. 2126. "Furthermore, it must be stressed that the determination of what is material can only be made on a case by case basis." *Life Investors*, 1981 WL 1698 *6.

Plaintiffs argue that, at the time defendants purchased the plaintiffs' shares in Twin City, the defendants were aware that: (1) Aggregate had decided to forego any further financial support of Superior; (2) Aggregate desired to divest its interest in Superior; (3) the essential terms of a settlement between Superior and Lehigh had been defined; and (4) favorable financing would be available to Superior without personal guarantees. Plaintiffs claim that they were unaware of such information and that such information should have been disclosed to them because it material-ly affected the value of Plaintiffs' stock in Twin City. Defendants' withholding of this information, plaintiffs contend, constitutes insider trading in violating of Iowa Code § 502.402 (2003).

Defendants contend that there was nothing material to disclose with regard to these issues at the time Peter Dunning signed the Stock Purchase Agreement. Further, defendants argue that Plaintiffs have not produced any evidence to suggest that the above-referenced items would have had a significant effect on the market price of Plaintiffs' interest in Superior or that the above-referenced information was not generally available to the public. Defendants argue that Plaintiffs have not produced any evidence that defendants' knowledge of any of the above-referenced material was "gained from [their] relationship" as a director of Twin City. Finally, defendants claim that they cannot be found liable for insider trading if they had reason to believe that Plaintiffs were also in possession of the information at issue.

As discussed in detail above, Aggregate had not decided to forego any further financial support of Superior. Defendants testified credibly that they did not actually believe Aggregate's posturing that it would withhold further financial support. Further, prior to Peter Dunning's signing the Stock Purchase Agreement, Aggregate had changed its tune and was discussing alternate modes of financing with Superior. Thus, this does not constitute "material information which is of decisive importance." Similarly, neither was Groff's casual inquiry as to Twin City's desire to acquire Aggregate's interest in Superior. Finally, favorable financial was not available to Superior without personal guarantees as of the time Peter Dunning signed the Stock Purchase Agreement. Thus, this cannot constitute

"material information which is of decisive importance."

■ With respect to the Superior–Lehigh settlement, the court finds that the current status of the ongoing negotiations were not communicated to the plaintiffs. Moreover, the court finds that, while a reasonable shareholder would consider this information to be material, the plaintiffs have not produced evidence that this information "[w]ould significantly affect the market price" the Dunnings or any other investor would have accepted for their interest in Superior, as required by the plain language of Iowa Code § 502.402 (2003). Plaintiffs' insider trading claim must fail.

### Aiding and Abetting Insider Trading

According to footnote nine in plaintiffs' trial brief:

> Defendants Greg Bush and Frank McCarthy are liable as the parties involved in the negotiations and transactions. Defendants Lawrence P. Bush, Joseph D. Bush, Barbara S. Johnson, Thomas M. Bush, Peter A. Bush, and Mary P. Walsh are liable pursuant to Iowa Code § 502.503 (2003). This section permits claims and damages against an affiliate of a person found liable, and therefore, all Defendants named herein are liable through principles of agency law.

Plaintiffs did not establish its insider trading claim against defendants Greg Bush and Frank McCarthy. Thus, the other defendants cannot be found liable for aiding and abetting insider trading. Moreover, plaintiffs produced no evidence at trial that the other defendants were, in fact, "affiliates" of Bush and McCarthy under principles of agency law. The court finds in favor of defendants Lawrence P. Bush, Joseph D. Bush, Barbara S. Johnson, Thomas M. Bush, Peter A. Bush, and Mary P. Walsh on plaintiffs' aiding and abetting insider trading claim.

### Breach of Contract

■ "In a breach-of-contract claim, the complaining party must prove: (1) the existence of a contract; (2) the terms and conditions of the contract; (3) that it has performed all of the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach." *Molo Oil v. River City Ford Truck Sales,* 578 N.W.2d 222, 224 (Iowa 1998).

■ "Under the common law of Iowa, parol evidence is admissible to shed light on the parties' intentions, but it may not be used to modify or add to the contract terms." *C–Thru Container Corp. v. Midland Mfg. Co.,* 533 N.W.2d 542, 544 (Iowa 1995) (citations omitted). *See also Khabbaz v. Swartz,* 319 N.W.2d 279, 282 (Iowa 1982) (noting that parol evidence can be used in interpreting a contract found to be ambiguous). "Ambiguity exists when, after application of principles of contract interpretation, a genuine uncertainty remains as to which one of two or more meanings is the proper one." *Tropf v. American Family Mut. Ins. Co.,* 558 N.W.2d 158, 159 (Iowa 1997). Ambiguous has also been defined to mean "of doubtful nature or meaning," "uncertain," and "equivocal." *McCarthy v. McCarthy,* 162 N.W.2d 444, 448 (Iowa 1968).

■ In the Membership Interest Redemption Agreement, the buyer is identified as Superior Minerals Company and the seller is identified as Aggregate Industries. (Pl. Ex. 26). The plaintiffs contend that the redemption agreement does not trigger a revaluation of the Dunning Stock Purchase Agreement because a "redemption" does not qualify as a "purchase" by the defendants of the interests in Superior owned by Aggregate. The court does not agree. Section 1.4 of the Stock Purchase Agreement is triggered if "Buyers or a

related or affiliated entity purchase substantially all of the shares in Superior owned by Aggregate Industries ..." Buyers are defined in the first paragraph of the Agreement as the defendants in this case "or any entity owned by Buyers". At this point, the defendants owned one hundred percent of Twin City which, in turn, owned fifty percent of Superior. Section 1.4 of the Agreement states that if the buyers or a related or affiliated entity purchase Aggregate's interest in Superior, then the purchase price for the Dunning Stock Purchase Agreement was to be revalued. The plaintiffs argue that Superior was not a "related or affiliated entity," of the redeeming party (Superior) because Twin City only owned fifty percent of Superior prior to the transaction. There is no support in this record for a construction of this contract that required complete or even majority ownership of another entity for it to be considered "related or affiliated". To the extent this provision of the contract is ambiguous, Mr. Giudicessi's July 25, 2003, memorandum makes it clear that it was the plaintiffs' intention that a revaluation pursuant to Section 1.4 would be triggered in the event of any change of control over Superior, by any means.

The plaintiffs' next breach of contract claim is that the valuation of the plaintiffs' shares was done improperly. Plaintiffs offer two different ways to value plaintiffs' shares. First, because Section 1.4 of the contract contemplates a cash transaction and part of the consideration for the transaction involved the transfer of the cement contract, the parties should be free to value the shares in any other reasonable method. Plaintiffs offer the testimony of William Allen who valued the shares pursuant to the discount free cash flow model which Mr. Allen claims to have developed specifically for the aggregate industry. The other method he used is called a multiple of EBIDA (Earnings Before Interest, Depreciation and Amortization). Using the discount free cash flow method, Mr. Allen opines that Superior should have been valued after the redemption agreement between $12.5–14 million.

Plaintiffs next challenge the valuation of their shares using the same valuation method the defendants use. However, the plaintiffs contend that the cement contract was substantially undervalued and that there was other consideration given for Aggregate's interests. *See* Plaintiffs' Ex. 80.

Plaintiffs' first theory is flawed for two reasons. First, nothing in the contract provides for a valuation using either of Mr. Allen's valuation models. Second, plaintiffs' theory is based on the premise that the transfer of the cement contract instead of cash requires the parties to resort to some other valuation method. However, plaintiffs do not claim that the cement contract cannot be valued. In fact, they have attempted to do so.

Plaintiffs' second contract theory is premised on the assertion that the cement contract providing for 5,500 tons of cement for five years was undervalued at $1.58 million. Plaintiffs contend that the transfer of this cement contract to Aggregate had a value of $2.3 million. Mr. Allen's calculation of the value of the cement contract was highly flawed. First, Mr. Allen opined that the cement was worth approximately 85 dollars per ton in the first of the five years. He then arbitrarily increased that price six percent for each of the subsequent years of the contract.

Mr. Allen is not and has not been familiar with the price of cement in the midwestern part of the United States. He has never valued a contract like this one. He did nothing to determine the actual price for cement in the relevant market in any of the years included within his opinion. Plaintiffs' earlier expert was fired by Peter Dunning for using a substantially lower

figure for the market value of cement because Dunning believed the earlier expert's number to be too high. Mr. Dunning should have superior knowledge to that of Mr. Allen as to the price of cement in the Midwest. Mr. Dunning's opinion was that the annual increase in the price of cement should only have been escalated by less than three percent per year. Further evidence that the cement contract was not overvalued came from Mr. McCarthy who had offered the contract to a related company who chose not to take it for $1.58 million. Aggregate Industries was in a good position to value this cement in an arm's length transaction. Plaintiffs have not proved that it was improperly valued at $1.58 million.

Finally, the plaintiffs contend that upon the termination of the Lehigh Superior venture, the defendants abandoned property worth $250,000 at the site that went to Aggregate. It also contends that Linwood paid an additional $997,000 to Aggregate as a part of some notes payable to Aggregate. The evidence just did not bear out the plaintiffs on these issues. First, no one at Twin City or Superior wanted the equipment left behind from the Lehigh venture. It was fully examined, determined to have no value and its abandonment was ratified by the Dunnings. Second, there was no evidence that proved that $997,000 in additional notes payable related consideration was provided as part of this transaction. It just did not happen.

At the close of the deal between the plaintiffs and Aggregate, mutual non-competition clauses were inserted into the agreement by lawyers without objection from anyone. The plaintiffs contend that these non-compete clauses provided additional value but no one attempted to value them. They had no value as neither entity had a desire to compete with one another. The plaintiffs have failed to prove this breach of contract theory.

**IT IS SO ORDERED** that the claims in this matter are dismissed. The Clerk of Court shall enter judgment in defendants' favor and against plaintiffs on all claims.